**In the United States District Court**
**For the District of Columbia**

THE EQUAL RIGHTS CENTER et al.,

        **Plaintiffs,**

v.

DISTRICT OF COLUMBIA,

        **Defendant.**

**Civil Action No. 07-01838 (RCL)**

PLAINTIFF'S MOTION FOR
CERTIFICATION OF A CLASS
AND MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF

# TABLE OF CONTENTS

**MOTION FOR CLASS CERTIFICATION** ...................................................... - 3 -

**NOTICE OF MOTION** ........................................................................... - 3 -

**RELIEF SOUGHT** ............................................................................... - 4 -

**MEMORANDUM OF POINTS AND AUTHORITIES** ...................................... - 1 -

**I.    INTRODUCTION & SUMMARY OF THE ARGUMENT** ..................... - 1 -

**II.   STATEMENT OF FACTS** ............................................................ - 1 -

A.   **Background on the Deaf Community.** .................................... - 1 -

B.   **Background of the Case.** ................................................... - 6 -

C.   **The Government's Actions Against Mr. Mitchiner Indicate
     Discrimination Against All Deaf and Hard of Hearing Persons** ............. - 7 -

D.   **The Government's Actions Against Mr. Nelson Indicate
     Discrimination Against All Deaf and Hard of Hearing Persons** ........... - 12 -

**III.  PROPOSED CLASS** ................................................................... - 13 -

**IV.   ARGUMENT** .......................................................................... - 15 -

A.   **Standards for Class Certification** ....................................... - 15 -

B.   **The Numerosity Requirement Is Met** .................................. - 16 -

C.   **The Commonality Requirement Is Satisfied** .......................... - 19 -

D.   **The Typicality Requirement Is Met** .................................... - 21 -

E.   **The Adequacy of Representation Requirement Is Met** ............... - 26 -

F.   **The Washington, D.C. Government Has Refused To Provide Services
     To A Class Of Citizens** ..................................................... - 27 -

**V.    CONCLUSION** ........................................................................ - 29 -

## **EXHIBITS**

Exhibit A:      Expert Report of Martina J. Bienvenu

Exhibit B:      ERC 00812, Excerpt from Exhibit 3 to Deposition of Traci Higgins

Exhibit C:      Excerpts from Deposition of Jon Mitchiner

Exhibit D:      ERC 9954, Metropolitan Police Department "Blue Card"

Exhibit E:      Excerpts from Deposition of Captain Edward Delgado

Exhibit F:      Excerpts from Deposition of David Nelson

Exhibit G:      Excerpts from Deposition of Derek Orr

Exhibit H:      Supplementary Responses to Defendant's Interrogatories and Request for
               Production of Documents to Plaintiff, Equal Rights Center

Exhibit I:      Plaintiff Equal Rights Center Second Supplementary Responses to Defendant's
               Interrogatories and Request for Production of Documents

Exhibit J:      Excerpts from Deposition of Jane Golightly

Exhibit K:      Excerpts from Deposition of Harvey Grossinger

Table of Authorities

**Page(s)**

### CASES

*Baby Neal for and by Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994)............................................................................................32

*Bynum v. District of Columbia*,
    214 F.R.D. 27 (D.D.C. 2003)...................................................................................23, 26, 31

*Civic Ass'n of the Deaf of N.Y.C. v. Giuliani*,
    970 F. Supp. 352 (S.D.N.Y. 1997) ...........................................................................25

*Pendleton v. Schlesinger*,
    73 F.R.D. 506 (D.D.C. 1977), aff'd, 628 F.2d 102 (D.C. Cir. 1980)......................................23

*Schreiber v. NCAA*,
    167 F.R.D. 169 (D. Kan. 1996)..................................................................................23

*Siddiqi v. Regents of Univ. of Cal.*,
    2000 WL 33190435 (N.D. Cal. September 6, 2000) ..........................................................24, 25

*Twelve John Does v. District of Columbia*,
    117 F.3d 571 (D.C. Cir. 1997) ..................................................................................30

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ..................................................................................32

### STATUTES

29 U.S.C. § 705(20) ....................................................................................................31

42 U.S.C. § 12131(2) ..................................................................................................31

### RULES

Fed. R. Civ. Pro. 23(a) ..............................................................................................19, 20

Fed. R. Civ. Pro. 23(a)(1) ........................................................................................20, 23

Fed. R. Civ. Pro. 23(a)(2) ........................................................................................ 23-25

Fed. R. Civ. Pro. 23(a)(3) ........................................................................................25, 30

Fed. R. Civ. Pro. 23(a)(4) ........................................................................................ 30-31

Fed. R. Civ. Pro. 23(b) ............................................................................................. 19-20, 31

Fed. R. Civ. Pro. 23(b)(2) ............................................................................................. 31-32

## MOTION FOR CLASS CERTIFICATION

Plaintiffs, by and through undersigned counsel, move this Court, pursuant to Federal Rule of Civil Procedure 23(b)(2) for certification of the proposed Class as described herein for the reasons set forth herein.[1]

WHEREFORE, Plaintiffs request that this Court enter a class certification order:

a.      Granting Plaintiff's Motion for Class Certification;

b.      Certifying the Class identified herein;

c.      Ordering that Mr. Jon Mitchiner and Mr. David Nelson be appointed to serve as class representatives on behalf of the Class;

d.      Ordering that the Law Offices of Steptoe & Johnson LLP be appointed to serve as counsel on behalf of the Plaintiffs and the Class; and

e.      Granting Plaintiffs and the proposed Class such other and further relief as the nature of their cause requires.

## NOTICE OF MOTION

PLEASE TAKE NOTICE, that Plaintiffs move the Court for Class Certification.  This Motion is based upon this Notice, this Motion and Memorandum of Points and Authorities in Support Thereof, and all documents and arguments submitted in support thereof, as well as all additional evidence and argument hereinafter submitted.

---

[1] Pursuant to the Court's most recent order, the instant class certification motion is due today, July 22, 2010.  A motion is currently pending before the Court to extend that date until September 2, 2010 to accommodate completion of expert discovery  The Court has not yet ruled on that motion, and has set a status hearing for tomorrow, July 23, 2010.  It is unclear whether the Court intended by these events to maintain the July 22 date for filing of the instant motion.  Out of an overabundance of caution, Plaintiffs therefore file the instant motion to satisfy the Court's order.  The parties have nonetheless agreed, and would request corresponding leave from the Court, to allow Plaintiffs to withdraw the instant motion in favor of a revised motion to be filed at a later date consistent with whatever period the Court will allow.

**RELIEF SOUGHT**

Plaintiffs ask the Court to certify that this action may proceed under Federal Rule of Civil

Procedure 23(b)(2) for injunctive relief on behalf of the Class (as defined below).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION & SUMMARY OF THE ARGUMENT**

Plaintiffs bring this action on behalf of an estimated thousands of class members and applicants who, due to a hearing loss or limitation, use American Sign Language ("ASL") as a primary means of communication.  The case concerns deficiencies in government-wide policies and procedures that have a systemic impact on deaf citizens attempting to use government services in the District of Columbia.  Specifically, Plaintiffs allege that the District of Columbia has failed to provide means for deaf and hard of hearing persons to effectively communicate with the D.C. government ("Government" or "District").  As a result, deaf and hard of hearing persons do not have equal access to D.C. government services or benefits as the hearing community.

As explained below, Plaintiffs satisfy the requirements for certification under Rule 23(a).  Certification of the claims for injunctive relief is also proper under Rule 23(b)(2), because the Government has acted, and refused to act, on grounds applicable to the class as a whole.  Despite notification of lack of resources to allow deaf and hard of hearing (collectively "Deaf") to obtain Government services, the Government has refused to provide translators or other means for deaf and hard of hearing persons to communicate with Government employees to allow deaf and hard of hearing persons to access government services.

**II.     STATEMENT OF FACTS**

    **A.     Background on the Deaf Community.**

Many Americans have a disability in that they are deaf, and as such cannot adequately hear spoken language.  The inability to hear prevents such people from modulating their own speech, such that most Deaf people cannot speak clearly.  People who are Deaf are, therefore, generally unable to effectively communicate through hearing or speech.  A segment of the Deaf

population relies primarily upon the visual language of American Sign Language ("ASL") to communicate.  ASL is visual language based on body movements.  Those who use ASL for their primary means of communication view themselves as members of the Deaf community, and part of Deaf culture.[2]

The District has a disproportionately high Deaf population community due to the presence of Gallaudet University and the Federal Government.  The University itself has over 1500 Deaf students, faculty and staff, and the surrounding area thus tends to provide services and programs tailored for Deaf people.  Many Deaf people settle in and around the District permanently due to the presence of Gallaudet with a resulting higher percentage of Deaf persons, and services and programs for Deaf people, in this area.  The Federal Government in the District is also a source of federal jobs; people with disabilities have always found employment more easily with the federal sector than the private sector, and are overrepresented for that reason in Federal Governmental employment.[3]

As described in significant detail in the attached report of Martina J. Bienvenu, there are a great many misconceptions in the hearing world about the Deaf.  For example, there is widespread belief that the Deaf understand English, that the Deaf can communicate using written notes, and/or that the Deaf can communicate orally by reading lips and speaking.  Based on these misconceptions, the hearing community generally does not appreciate why ASL interpreters are necessary, believing that exchange of written notes and/or lip reading should be sufficient.[4]

---

[2] *See See Expert Report of Martina J. "MJ" Bienvenu dated April 26, 2010* (the "Bienvenu Report"), relevant excerpts attached hereto as Ex. A, at 3-4.

[3] *See id.* at 19.

[4] *See id.* 5.

In reality English is a second language for the deaf community that relies upon ASL. This is primarily because the ability to learn any spoken language is based on the ability to hear the words.  Children are often taught to read by sounding out the words, and the teachers or parents can correct inaccuracies by changing incorrect grammar and pronunciation.  This is the fundamental basis of building grammar and vocabulary.  For Deaf people, pronunciations inherently tend to be inaccurate because of the impact that being Deaf has on the ability to speak, and there is no ability to hear such incorrect pronunciation.  For example, a well advertised method of learning is called "Hooked on Phonics," which is a sound-based learning system; Deaf people could not use such a method because they cannot hear the sounds.  This barrier to learning to read English translates directly into a difficulty in learning English, and a corresponding limit on the resulting mastery of the English language.[5]

The English level comprehension of Deaf people is thus substantially lower than hearing people.  Studies show that the average performance on tests of reading comprehension for Deaf students is roughly six grade equivalents lower than their hearing peers at age 15.  The average English reading and writing level for Deaf people upon graduation from high school has been consistently reported to be at roughly 3rd to 4th grade level, akin to the level of an average 10 year-old hearing child.[6]

The barriers to learning the English language translate directly to barriers in reading and writing the English language.  For this reason, it is very difficult for the average member of the Deaf community to communicate with hearing people through written notes. The situation is analogous to any person who has a primary language other than English, such as Spanish.  A

---

[5] *See id.* at 5-6.

[6] *See id.*

primary Spanish speaker can read and write words, but may not be able to read and write in English.[7]

Deaf people typically obtain at least some rudimentary ability to read and write to be able to go about the routines and recurring activities in life.  For example, most Deaf people can read restaurant menus and street signs.  Generally this is because the contents of such materials are somewhat routine and predictable.  For example, members of the Deaf community generally know what the word "STOP" means, as it appears as part of a red sign in the streets in the shape of an octagon that controls car traffic that they encounter frequently.  They learn what the sign means early in life and thus recognize it in the future.[8]

For those of the Deaf community who have jobs, the establishment of routine, predictable, and common subject matter will typically allow a Deaf person to go about his/her job without the need for an interpreter.  But for job matters outside of the routine, such as meetings, evaluation of work performance, requests for promotion, or other personnel action, most members of the Deaf community would need an interpreter because the nature of the conversation exceeds the ability to communicate effectively with written notes.[9]  This is reflected in the policy of the Federal Government: "[a]lthough a notepad and pen for written communication may be sufficient for simple conversations, an interpreter may be necessary when the information is complex, or the exchange is lengthy."[10]

---

[7] *See id.* at 7-8.

[8] *See id.*

[9] *See id.*

[10] *See* Ex. 3 to Deposition of Traci Higgins at ERC 00812 (attached hereto as Ex. B).

Another common erroneous assumption is that Deaf people can read lips and will be able to have a successful interaction using this means of communication. One study noted that 2/3 of physicians estimate that 85% of English words can be read by lipreading, when in fact less than 30% of the sounds used in the English language are visible on the lips.  On average, 60% comprehension can be achieved under ideal conditions. Some members of the Deaf community have sufficient ability in English, lip-reading, and speech that they can communicate with a hearing person for certain basic matters that may not require an interpreter, but this is the exception rather than the rule.[11]

As set out above, English is a second language for those in the Deaf community who rely upon ASL.  Their command of English may be sufficient to navigate the routine issues of life, but for more complicated interactions - particularly those of obtaining many government services - an ASL interpreter is necessary to provide Deaf people with effective and clear communication with hearing people.  As such, some form of interpreter is necessary when the communication is more than short or simple, is beyond the routine and predictable circumstances of their lives, and/or affects a person's rights or status.  The American with Disabilities Act and related local District laws protect and require that the Deaf be provided with interpreters to allow them to have comparable access to District services as the hearing.[12]

Nonetheless, most Deaf people have experienced not receiving an interpreter despite having requested one.  The reason is essentially grounded in the misperceptions discussed above. Most of the hearing community presumes that Deaf people can communicate through English, notes and/or lip reading, such that no interpreter is necessary.  Given the effort to locate an ASL

---

[11] Ex. A, *Bienvenu Report* at 8.

[12] *See id.* at 9.

interpreter and the corresponding expense, it has effectively become common for the hearing community to decline requests by Deaf people for ASL interpreters.  It happens often, beginning at an early age, such that most adult Deaf people view the lack of interpreters as the norm. Essentially they have been denied so many times that they simply stop asking and accept the discrimination.[13]

The instant litigation is brought by two Deaf individuals as representatives of the Deaf community as a class to bring an end to such discriminatory practices by the District.

B.     **Background of the Case.**

Although discovery is not yet fully completed,[14] discovery which has been completed indicates that the scope of the Government's failure to provide services to deaf and hard of hearing persons has been widespread and ongoing.  Dozens of District citizens have voiced complaints that they have either failed to receive requested interpreters from the District and/or that a District provided interpreter was not qualified.  The Government's discrimination against Plaintiffs due to their class status as deaf and hard of hearing individuals seeking services or benefits from the Government is indicative of the Government's treatment of the entire class.

Approximately one year after this litigation was filed, the District, through the Office of Disability Rights ("ODR"), enacted the "effective communication policy" which establishes the ODR as a centralized body for providing District citizens with sign language interpreters on sufficient notice.  Plaintiffs have applauded the enactment of this policy and view it as a significant step forward in giving the deaf equal access to government services as the hearing community.  However, the policy has its limitations, in that ODR does not provide all DC

---

[13] *See id.* at 8-9.

[14] Plaintiffs reserve the right to amend, modify or supplement the Motion and/or this Memorandum upon the completion of expert discovery.

agencies and subcontractors with sign language interpreters.  ODR and the "effective

communication policy" do not fully resolve the Government's failure to provide services to deaf

and hard of hearing persons.[15]

### C.    The Government's Actions Against Mr. Mitchiner Indicate Discrimination Against All Deaf and Hard of Hearing Persons

The Government discriminated against Jon Mitchiner as a deaf individual.  Mr. Mitchiner

cannot hear or understand speech.  Mr. Mitchiner relies on ASL for effective in-person

communication at meetings and interviews with government agencies.  The Government has on

multiple occasions failed to provide Mr. Mitchiner with interpretive services.  The following

incidents are exemplary:

1. *Lack of Interpreter & Unqualified Interpreter with Office of Zoning (OZ)*

In 2006/2007, Mr. Mitchiner was seeking approval from the D.C. Board of Zoning

Adjustment to build a garage on his property at 314 12th Street, NE, Washington, D.C. 20002.

The Board of Zoning is part of the D.C. Office of Zoning.  It set a hearing on Mr. Mitchiner's

request for May 22, 2007, at 10:30 am.

On January 18, 2007, Mr. Mitchiner contacted the D.C. Office of Zoning to request an

ASL interpreter at the May 22 hearing, in order to allow for his effective communication during

those proceedings.  Ms. Sara Bardin, a special assistant in the Office of Zoning, responded to Mr.

Mitchiner's request on January 19, 2007, assuring him that an ASL interpreter would be present

at the hearing.  On May 11, 2007, Mr. Mitchiner contacted several staff members of the Office of

Zoning, again to remind them of his need for an ASL interpreter during the May 22 hearing, and

Ms. Bardin responded on May 21, 2007 to confirm that an interpreter would be provided at Mr.

---

[15] *See* Ex. A, *Bienvenu Report* at p. 27 ("Notwithstanding the significant improvements by the District by the actions of ODR . . . they do not place Deaf people on equal footing with the hearing inn their communications with District agencies and use of District programs.")

Mitchiner's hearing.

On May 22, 2007, the D.C. Board of Zoning began Mr. Mitchiner's hearing before an interpreter arrived. Unable to communicate effectively, Mr. Mitchiner was forced during the hearing to take an oath without understanding fully the substance of such an act.[16] The interpreter, Ms. Dominique Evans, arrived during a recess of the hearing proceedings granted as requested by Mr. Mitchiner's architect.[17] The interpreter herself -- Ms. Evans -- was hard-of-hearing. She was not a qualified or professional interpreter. Ms. Evans was not registered as a professional interpreter with the Registry of Interpreters for the Deaf. She appeared to have no formal interpreting training. Her only interpreting experience was from religious services.

Ms. Evans lacked expressive and receptive skills in ASL. She failed to interpret large portions of the hearing and lacked the legal vocabulary to do so. Furthermore, she did not understand what Mr. Mitchiner was signing. As a result, Mr. Mitchiner was forced to rely on a prepared written statement to make his case during the hearing;[18] for this statement, the interpreter merely read from the statement rather than interpreting what Mr. Mitchiner actual said. Ex. A, *Bienvienu* Report at p.23 ("she was reading from a copy of the statement that Mr. Mitchiner had apparently previously provided, and only occasionally looked up from the document to look at Mr. Mitchiner (which I interpreted as a timing spot check).") Mr. Mitchiner wanted to interject during the hearing, but refrained from doing so for fear that Ms. Evans would misinterpret his testimony.[19]

---

[16] *See See Deposition of Jon Mitchiner ("Mitchiner Dep.")* relevant excerpts attached hereto as Ex. C,  at 73:1-2.

[17] *See* Ex. C, *Mitchiner Dep.* at 77:1-8.

[18] *See* Ex. C, *Mitchiner Dep.* at 78:12-22.

[19] *See* Ex. C, *Mitchiner Dep.* at 88:14-20.

Mr. Mitchiner was offered a postponement of the judgment in his case.[20]  This postponement was not offered because of the lack of effective communication, but was due to a potential change in the law that could affect Mr. Mitchiner's petition.[21]  Due to Ms. Evans' inability to interpret, Mr. Mitchiner did not fully understand the implications of this postponement, and thus accepted the postponement.

Mr. Mitchiner was unable to understand or participate in his hearing and was prevented from making an informed decision about the status of his case as a result of the Office of Zoning's failure to provide a qualified ASL interpreter.  Mr. Mitchiner has suffered and continues to suffer frustration, humiliation, exclusion from equal access to government, and  loss of dignity as a result of the Office of Zoning's failure to provide a qualified ASL interpreter.

2.  *Lack of Interpreter with Metropolitan Police Department (MPD)*

In 2005, Mr. Mitchiner had a dispute with a contractor working at his home.  The contractor left the premise taking with him certain documentation that belonged to Mr. Mitchiner.[22]  In response to the contractor's actions, Mr. Mitchiner contacted the DC police through either TTY, video phone or relay and requested that someone be sent to his house.[23]

The police arrived in about 15-30 minutes.[24]  Pursuant to Police General Order 304.14, police officers are to carry with them a blue card akin to a Miranda card which states that the District will provide a deaf citizen with a sign language interpreter if requested. ("Blue Card";

---

[20] *See* Ex. C, *Mitchiner Dep.* at 92:5-9.

[21] *See* Ex. C, *Mitchiner Dep.* at 89:8-12.

[22] *See* Ex. C, *Mitchiner Dep.* at 150:5-7.

[23] *See* Ex. C, *Mitchiner Dep.* at 150:9 – 151:8.

[24] *See* Ex. C, *Mitchiner Dep.* at 152:2–4.

attached hereto as Exhibit D).[25]  The blue card was not presented to Mr. Mitchiner, and he was unaware of his rights to an interpreter.[26]

No interpreter was brought to the scene and Mr. Mitchiner was forced to communicate with police through written notes.[27]  Without an interpreter, Mr. Mitchiner attempted to communicate through written notes and requested that the contractor either be arrested or required to return the documentation.[28]  When it became apparent that the first officer did not want to deal with the problem, Mr. Mitchiner requested that a supervisor be summoned.[29]

Another police officer, who Mr. Mitchiner understood to be a supervisor, arrived at the scene.[30]  Since no interpreter had been provided, Mr. Mitchiner began using written notes to explain what happened to the supervisor.[31]  While he was writing the supervisor strongly grabbed Mr. Mitchiner's arm and pulled his arm so that he could not continue writing.[32]  Mr. Mitchiner felt threatened and intimidated and discontinued written communication with the police.[33]

---

[25] *See Deposition of Captain Edward Delgado ("Delgado Dep.")* relevant excerpts attached hereto as Ex. E, at 130:12 - 133:12.

[26] *See* Ex. C, *Mitchiner Dep.* at 157:8-19.

[27] *See* Ex. C, *Mitchiner Dep.* at 152:16-20.

[28] *See* Ex. C, *Mitchiner Dep.* at 152:16-20.

[29] *See* Ex. C, *Mitchiner Dep.* at 152:22 – 153:7.

[30] *See* Ex. C, *Mitchiner Dep.* at 153:2-4.

[31] *See* Ex. C, *Mitchiner Dep.* at 153:12-20.

[32] *See* Ex. C, *Mitchiner Dep.* at 153:12 - 154:18.

[33] *See* Ex. C, *Mitchiner Dep.* at 156:12-15; 162:21 – 162:2.

Mr. Mitchiner made a complaint about the incident to the police department. [34]  The

police officer who was sent to Mr. Mitchiner's home to investigate the incident was the same

officer who had grabbed Mr. Mitchiner's arm. [35]  No interpreter was provided to Mr. Mitchiner

on this follow-up visit. [36]

Mr. Mitchiner once again felt intimidated as the officer who had assaulted him was

asking whether he now wanted to follow up on his complaint and fill out a complaint form. [37]

Mr. Mitchiner therefore declined to file the complaint and dropped the matter. [38]

    *3.*    *Lack of Interpreter with Department of Consumer and Regulatory Affairs (DCRA)*

On a number of occasions in 2004-2005, Mr. Mitchiner sought to communicate with the

Department of Consumer and Regulatory Affairs (DCRA) with respect to obtaining permits for

renovations to his home. [39]  Since DCRA failed to provide an interpreter, Mr. Mitchiner had to

communicate with DCRA through written notes. [40]  Unfortunately, that communication was not

effective.  After filling out a permit application, Mr. Mitchiner would wait to have the

application reviewed by DCRA.  When it was his turn, a DCRA employee would review the

permit request and inform Mr. Mitchiner that "Something's wrong." [41]  However, the employee

was unwilling to write an explanation of what was wrong with the application.  Since DCRA did

---

[34] *See* Ex. C, *Mitchiner Dep.* at 158:1-16.

[35] *See* Ex. C, *Mitchiner Dep.* at 158:1-16.

[36] *See* Ex. C, *Mitchiner Dep.* at 158:1-16.

[37] *See* Ex. C, *Mitchiner Dep.* at 158:1-16; 160:19 – 161:5; 163:8-20; 166:18-19.

[38] *See* Ex. C, *Mitchiner Dep.* at 162:11 – 164:13.

[39] *See* Ex. C, *Mitchiner Dep.* at 126:2-7.

[40] *See* Ex. C, *Mitchiner Dep.* at 129:14.

[41] *See* Ex. C, *Mitchiner Dep.* at 128:11-14.

not provide an interpreter, Mr. Mitchiner was unable to effectively communicate with DCRA.[42]

In 2007, Mr. Mitchiner once again had reason to return to DCRA.  Before going to DCRA, Mr. Mitchiner contacted DRA via e-mail to request an interpreter.[43]  Although he requested an interpreter, none was provided.[44]

  4. *Lack of Auxiliary Aids for Participation in DC Commission on Persons with Disabilities (DCCPD) Meetings.*

Since 2008, Mr. Mitchiner has been a member of the DC Commission on Persons with Disabilities (DCCPD).[45]  The Commission generally meets monthly.[46]  Prior to the July 2009 meeting, Mr. Mitchiner requested to attend the July meeting by remote access.  He was told that they were unable to accommodate him because there was no equipment available.[47]  As a result, Mr. Mitchiner was unable to attend the meeting remotely.

**D. The Government's Actions Against Mr. Nelson Indicate Discrimination Against All Deaf and Hard of Hearing Persons**

The Government discriminated against David Nelson as a deaf individual.  Mr. Nelson cannot hear or understand speech.  Mr. Nelson relies on ASL for effective in-person communication at meetings and interviews with government agencies.  The Government has on multiple occasions failed to provide Mr. Nelson with interpretive services.  The following two incidents are exemplary:

---

[42] *See* Ex. C, *Mitchiner Dep.* at 129:16-20.

[43] *See* Ex. C, *Mitchiner Dep.* at 131:11-12.

[44] *See* Ex. C, *Mitchiner Dep.* at 134:6-7.

[45] *See* Ex. C, *Mitchiner Dep.* at 56:3-4.

[46] *See* Ex. C, *Mitchiner Dep.* at 56:8-9.

[47] *See* Ex. C, *Mitchiner Dep.* at 61:1-5.

1. *Lack of Interpreter at Advisory Neighborhood Commission (ANC)*

Nelson resides in Advisory Neighborhood Commission (ANC) 6A of Ward Six. Prior to the summer of 2007, Mr. Nelson had met repeatedly with ANC Commissioner, Joseph Fengler, to request sign language interpreters at those meetings.[48] Mr. Nelson's efforts were unsuccessful, as Mr. Fengler informed Mr. Nelson that the ANC did not have the funds for interpreters, and that it had been unsuccessful in locating volunteer interpreters.[49]

In the summer of 2007, Mr. Fengler informed Mr. Nelson that the ANC would have to find the funds to hire a sign language interpreter, pursuant to a directive to all ANC's from the DC Office of Advisory Neighborhood Commissions (OANC).[50] Mr. Fengler also informed Mr. Nelson that although the OANC had directed all ANC's to provide sign language interpreters, the OANC did not provide the ANC's with funding for interpreters.[51] Therefore, Mr. Fengler informed Mr. Nelson that ANC 6A would only have the funds for one interpreter three or four times a year.[52] ANC 6A meets on a monthly basis,[53] and its subcommittees meet with more frequency.

2. *Lack of Interpreter at Prospect Learning Center*

On April 26, 2007, Mr. Nelson received a flyer invitation from Dr. Eve Byford-Peterson,

---

[48] *See Deposition of David Nelson ("Nelson Dep.")* relevant excerpts attached hereto as Ex. F, at 68:11-69:5.

[49] *See* Ex. F, *Nelson Dep.* at 68:11-69:5. As understood, the District contests Mr. Nelson's version of events.

[50] *See* Ex. F, *Nelson Dep.* at 85:17-85:15.

[51] *See* Ex. F, *Nelson Dep.* at 85:17-85:15.

[52] *See* Ex. F, *Nelson Dep.* at 86:22-87:9.

[53] *See* Ex. F, *Nelson Dep.* at 91:7-8.

Principal, to attend an Open House on May 3, 2007, at Prospect Learning Center, 920 F Street N.E., Washington, D.C.[54] The Prospect Learning Center is a District of Columbia Public School which provides special education for children with severe learning disabilities.

Mr. Nelson responded by email on that same day informing the school that he would be attending, and would need a sign language interpreter.[55] When he arrived, no interpreter had been provided.[56] As understood, the staff had not read his email beyond his RSVP, and was therefore unaware of Mr. Nelson's need for an interpreter.[57] The school staff did not know how to obtain an interpreter, and no interpreter was provided. The Open House took place as scheduled without any interpreter for Mr. Nelson. Even today, ODR is unable to provide an interpreter to a deaf individual in situation where the deaf person walks into a District office.

The experiences of Mr. Nelson and Mr. Mitchiner are indicative of the Government's treatment of deaf and hard of hearing persons. It has no policy for, or practice of, providing effective means of communication for those who are deaf or hard of hearing. This lack of services for deaf and hard of hearing persons has resulted in unfair treatment, denial of benefits, embarrassment, and frustration for deaf and hard of hearing persons.

## III.    PROPOSED CLASS

In their Amended Complaint, Plaintiffs assert claims on behalf of themselves and the following proposed class (the "Class"):

> All deaf and hard of hearing individuals who primarily rely upon
> American Sign Language for in-person communication and/or auxiliary aids for

---

[54] *See* Ex. F, *Nelson Dep.* at 51:10-53:21.

[55] *See* Ex. F, *Nelson Dep.* at 51:10-53:21.

[56] *See* Ex. F, *Nelson Dep.* at 56:1-59:15.

[57] *See* Ex. F, *Nelson Dep.* at 59:3-10.

telephone communication and used, attempted to use, availed themselves, or attempted to avail themselves of any service, benefit, activity, program, or requirement that was provided, sponsored, administered, supported, or required by the District of Columbia or any of its departments, agencies, or instrumentalities at any time during the period beginning October 10, 2004 to the present, and who were denied effective communication due to the lack auxiliary aids including qualified interpreter services; and all such individuals who did not use, attempt to use, avail themselves, or attempt to avail themselves of such services, benefits, activities, programs, or requirements during the same time period because they knew that their needs for auxiliary aids or and/or qualified interpreter services were not being met, and would not be met, by the District of Columbia.

The proposed class representatives for this Class are as follows (the "Class

Representatives"):

- Jon Mitchiner, a District of Columbia resident residing at 314 12th Street, NE, Washington D.C. 20002.

- David Nelson, a District of Columbia resident residing at 909 F. Street, N.E., Washington D.C. 20002.

Plaintiffs seek certification of the Class and appointment of the Class Representatives .

## IV.   ARGUMENT

### A.   Standards for Class Certification

To be certified as a class in a class-action lawsuit, Plaintiffs must meet four requirements

of Fed. R. Civ. Pro. 23(a): impracticality of joinder (numerosity), commonality, typicality, and

adequacy of representation.  Further, Plaintiffs must prove that one of the elements in Fed. R.

Civ. Pro. 23(b) is met.  Namely, Plaintiffs must prove that prosecution of separate actions by

individual members of the class would create a risk of inconsistent or varying results, or would

adjudicate the interests of other members of the class; the party opposing the class has acted or

refused to act on grounds applicable to the class; or questions of law or fact common to the class

predominate over any questions affecting only individual members, and a class action is a

superior method of adjudication for resolving the issues.  As discussed below, all the

requirements of Rule 23(a), and at least one of the elements of Rule 23(b) are met, and the Court should thus certify the class.

### B.      The Numerosity Requirement Is Met

Plaintiff must prove that that the class is so numerous that joinder of all class members is impracticable.  *See* Fed. R. Civ. Pro. 23(a)(1).  The number of deaf and hard of hearing persons who use and will use the services of the Government of the District of Columbia are so numerous that their joinder is impracticable.

The number of persons in the proposed class is estimated to be multiple thousands of persons.  Although there is no current accurate accounting of the number of Deaf persons living in the District of Columbia who require ASL,  prior census data identified some 25,000 people living in the District who either had "Difficulty hearing what is said in a normal conversation" or "unable to hear what is said in a normal conversation." [58]  The District has a regional center for the Deaf community due to the presence of Gallaudet University and the Federal Government. Many more visit the District for work or pleasure.  As a result, the Plaintiffs believe that "the number of Deaf persons living in the District of Columbia who require ASL certainly lies in the thousands, and possibly low tens of thousands."[59]

It is unknown exactly how many members of the deaf community have requested interpreters from the District Services but been denied same.  The District is in the best position to maintain such information, but has indicated that it does not do so.[60]

---

[58] *See* Ex. A, *Bienvenu Report* at p. 19.

[59] *See* Ex. A, *Bienvenu Report* at p. 19.

[60] *See also Deposition of Derek Orr ("Orr Dep.")* (relevant excerpts attached hereto as Exhibit G) at 193:7- 195:9 (Indicating that if someone complains to an individual agency, ODR "would never find that out" and they only track complaints that come directly to ODR.)

For example, the Metropolitan Police Department has a process for receiving complaints by citizens for failure to provide interpreters, but their were no (zero) records of any such complaints being filed.[61]  Yet electronic discovery of police emails from 2007-2009 includes several complaints voiced by deaf citizens, widespread breakdown in the Districts TTY (a text phone that the deaf used to make phone calls) capabilities from at least July 14, 2009 through early 2010, and incorrect information being provided to deaf citizens about how to contact the police for certain matters. [62]  Plaintiff has identified to the District other District citizens who have complaints about failing to receive interpreters in their interactions with police, and who allege that they did not receive the Blue Card that police are supposed to provide.[63]

 Plaintiffs for their part have identified to the District dozens of individuals with complaints, many of whom have multiple complaints.[64]  However, the number of complaints is not in and of itself indicative of the pool of complaints.  Specifically, deaf people culturally are not inclined to complain when they fail to receive an interpreter and/or fail to receive a qualified interpreter.  As set forth in Plaintiff's expert report:

> Most Deaf people have experienced not receiving an interpreter
> despite having requested one. . . .  It happens often, beginning at an
> early age, such that most adult Deaf people view the lack of
> interpreters as the norm.  Essentially they have been denied so

---

[61] Ex. E, *Delgado Dep.* at 219:4 – 221:21.

[62] Ex. E, *Delgado Dep.* at 221:21 - 249:5.

[63] *See Supplementary Responses to Defendant's Interrogatories and Request for Production of Documents to Plaintiff, Equal Rights Center (the "ERC Supplementary Response")* (attached hereto as Exhibit H) at p. 6 & *Plaintiff Equal Rights Center Second Supplementary Responses to Defendant's Interrogatories and Request for Production of Documents (the "ERC Second Supplementary Response")* (attached hereto as Ex. I)  at pp. 4-7.

[64] *See* Ex. H, *ERC Supplementary Response* at pp. 4-6 & Ex. I, *ERC Second Supplementary Response* at pp. 4-7.

> many times that they simply stop asking and accept the
> discrimination.
>
> Similarly, complaints by Deaf people about the lack of an
> interpreter – when they even know to whom they should complain
> – rarely results in interpreters being provided, such that adult Deaf
> people view complaining as useless. . . .  Also, many Deaf people
> are afraid that, if they complain, there will be some type of reprisal
> against them, such as further difficulties in obtaining whatever
> service they need.  For these reasons, Deaf people as a culture . . .
> rarely complain about the failure to receive an interpreter.
>
> Complaints by Deaf people over the lack of a qualified interpreter
> are also rare for the reasons discussed above with respect to lack of
> complaints for the failure to provide interpreters.
>
> [Thus,] as a culture, those within the Deaf community are unlikely
> to complain about the failure to receive a qualified interpreter, as
> they simply accept this failure to receive interpreters as the societal
> norm and/or believe that complaining will lead to reprisals.[65]

As a result, the "number of incidents involving a lack of an interpreter or a lack of a

qualified interpreter is substantially higher than indicated by the number of documented

complaints."[66]  The number of complaints by deaf citizens is therefore far greater than the dozens

of complaints which have been specifically identified by Plaintiffs to the District.  Ultimately,

the total number of complaints thus lies somewhere between the number of complaints identified

by Plaintiffs and the total number of deaf people in the District.

Thus, Plaintiffs estimate that the class will comprise hundreds, if not thousands of

members.  Although a specific number of class members is not known, it is not necessary that

the exact number of members of a class be known for the numerosity requirement to be

---

[65] Ex. A, *Bienvenu Report* at p. 8-9.

[66] Ex. A, *Bienvenu Report* at p. 20.

satisfied.[67]  A class of thousands of members satisfies Rule 23(a)'s numerosity requirement.

This Court has certified classes many times smaller.[68]

Because class members may come from all over the Washington, D.C. metropolitan area,

the United States, and the world, and may have moved, changed status, or relocated since the

time of their injuries, the class is geographically widely dispersed.[69]

In view of the size and geographic diversity of the class, joinder of all members is

impracticable, and the numerosity requirement is thus met.

### C.     The Commonality Requirement Is Satisfied

To qualify as a class, Plaintiffs must prove that there are questions of law or fact common

to the class.  *See* Fed. R. Civ. Pro. 23(a)(2).  This requirement is met if the class members share

at least one common issue of law or fact.  It is not necessary that every issue of law or fact be the

same for each class member.  *Bynum*, 214 F.R.D. at 33; *see also  Pendleton v. Schlesinger*, 73

F.R.D. 506, 508 (D.D.C. 1977), aff'd, 628 F.2d 102 (D.C. Cir. 1980) ("In passing on

commonality, it is not appropriate to examine the likeness or relation of the several claims of all

members of the class and their representatives. The only proper inquiry is, as the language [of

Rule 23(a)(2)] suggests, whether there is some aspect or feature of the claims which is common

to all.")

---

[67] *See Bynum v. District of Columbia*, 214 F.R.D. 27, 32-33 (D.D.C. 2003) (a precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity).

[68] *See, e.g., Bynum*, 214 F.R.D. at 33 (numerosity satisfied where record evidences 97 class members).

[69] *See Schreiber v. NCAA*, 167 F.R.D. 169, 174 (D. Kan. 1996)(geographical dispersion weighs in favor of class certification).

Plaintiffs meet the test for commonality, since the class members are all affected by common questions arising from the actions of the Government, including the following:

- Whether the D.C. Government  has failed to provide qualified sign language interpreters to class members attempting to use or avail themselves of the District's services, benefits, activities, programs, and requirements;

- Whether the D.C. Government failed to provide other auxiliary aids to class members attempting to use or avail themselves of the District's services, benefits, activities, programs, and requirements;

- Whether the D.C. Government's failure to provide such services violated Title II of the Americans with Disabilities Act, or Section 504 of the Rehabilitation Act, or both;

- Whether the D.C. Government intentionally or knowingly discriminated against Plaintiffs and other members of the class;

- Whether the D.C. Government violated the District of Columbia Human Rights Act; and

- Whether the D.C. Government's conduct, as described  in this complaint, caused injury to the Plaintiffs and other members of the class;

These common questions, at least, meet the requirement for commonality under Fed. R. Civ. Pro. 23(a)(2).

Other courts have held that an organization's failure to provide meaningful access to deaf and hard of hearing persons satisfied the commonality requirement and merited class certification.  For example, in *Siddiqi v. Regents of Univ. of Cal.*, 2000 WL 33190435 (N.D. Cal. September 6, 2000), the court found sufficient commonality to certify a class of deaf and hard of hearing students who sought injunctive relief to remedy the defendants' failure to provide meaningful access due to inadequate provision of sign language interpreters and other communication aids.  And in *Civic Ass'n of the Deaf of N.Y.C. v. Giuliani*, 970 F. Supp. 352 (S.D.N.Y. 1997), the court certified a class of deaf persons who would have been prevented from utilizing emergency city services.

Like *Siddiqi*, the Washington, D.C. government's failure to provide effective means of communication for deaf and hard of hearing persons, such as sign language translators or other communication aids, raises issues of law and fact common to the entire class of deaf and hard of hearing persons.

In this case, there is a widespread problem of the District failing to provide meaningful access to deaf and hard of hearing persons: "The ERC has reported/collected several dozen complaints by Deaf people against the District who either did not receive interpreters or did not receive qualified interpreters. . . . The District has also identified in discovery several additional people who have expressed complaints over the failure to receive interpreters or unqualified interpreters."[70]  However, because the Deaf community is accustomed to the District's failure to provide services to the Deaf people and expect that any complaints will lead to reprisals, "the number of incidents involving a lack of an interpreter or a lack of interpreter is substantially higher than indicated by the number of documented complaints."[71]

Thus, the commonality requirement is satisfied under Rule 23(a)(2).

**D.     The Typicality Requirement Is Met**

Plaintiffs must also show that the claims of the representative parties are typical of the claims of the class.  *See* Fed. R. Civ. Pro. 23(a)(3).  While the commonality requirement establishes that class members suffered an injury as a result of the Government's policies, the typicality requirement shows that the representative parties suffered an injury typical to all

---

[70] Ex. A, *Bienvenu Report* at p. 20.

[71] Ex. A, *Bienvenu Report* at p. 20.

members of the class.[72]  Where the claims are typical of the class, factual variations underlying the claims will not undermine the typicality requirement.[73]

Here, both of the representatives were prevented from receiving Government services because they could not efficiently communicate with Government employees.  "Both David Nelson and Jon Mitchiner are Deaf and rely upon ASL as their primary form of communication, such that their disability and need for ASL interpreters is typical of the class."[74]

Although Mr. Nelson and Mr. Mitchiner dealt with different agencies within the Washington, D.C. government, both Nelson and Mitchiner were denied adequate access to Government services, because the Government failed or refused to provide requested reasonable accommodations to allow Nelson and Mitchiner to communicate with Government employees. The Government's failure to provide such reasonable accommodations upon request is "also typical of the class."[75]

Both were "excluded from participation in or denied the benefits of services, programs, or activities of the District, and . . . the communications between the District and these individuals were not as effective as communications between the District and hearing individuals.  Such experiences are typical of the class. . . ."[76]

---

[72] *See Bynum*, 214 F.R.D. at 34.

[73] *Ibid*.

[74] Ex. A, *Bienvenu Report* at p. 20.

[75] Ex. A, *Bienvenu Report* at p. 20.

[76] Ex. A, *Bienvenu Report* at p. 20.

More specifically, Mr. Nelson's experience with Government's refusal to provide interpreters "is typical of Deaf members in the class."[77]  Mr. Nelson's allegations with respect to the ANC are thus typical of the class, in that (1) he needed an interpreter, (2) was denied an interpreter and (3) the reason he was denied an interpreter, that there was a lack of funds, is a typical reason that interpreters are denied.[78]  One class member, Ms. Golightly, indicated that she also needed an interpreter to attend ANC meetings which was not provided by ANC.[79]  Similarly, Mr. & Mrs. Grossinger were also denied an interpreter by the DC Public Schools due to a lack of funds.[80]  Plaintiff has identified numerous other class members who have complained that they were denied an interpreter.[81]

---

[77] Ex. A, *Bienvenu Report* at p. 22.

[78] Ex. A, *Bienvenu Report* at p. 22.

[79] *Deposition of Jane Golightly* 47:7-21 ("I asked for an interpreter and they said no") (relevant excerpts attached hereto as Ex. J).

[80] *Deposition of Harvey Grossinger* ("Grossinger Depo.") (relevant excerpts attached hereto as Ex. K) at 41:14 – 42:14 (Indicating that he was informed that he Public Schools could not provide an interpreter because they "don't have the money for – that was for one instance. Other times they said they could not find an interpreter").

[81] *See* Ex. H, *ERC Supplementary Response* at pp. 4-6 (describing problems of (i) Ms. Bannerman not being provided interpreters for her meetings with Probation Officers, (ii) Ms. Baches not receiving an interpreter when timely requested for OHA meeting, (iii) Mr. Benjamin not receiving an interpreter for meetings with his probation officer; (iv) Mr. Buckman being denied an interpreter during a visit to the DMV; (v) Mr. Graves requesting an interpreter but finding that no interpreter was present at the appointed time for a meeting at the DC Job Center, (vi)  Mr. Graves requesting an interpreter but finding that no interpreter was present at the appointed time for a meeting at the DMV Traffic Court, (vii) Mr. Graves being denied a request for a interpreter at DHS; (viii)  Ms. Holston being told that DC Employment Services lacked the resources to help deaf people, (ix) Ms. Holston being denied an interpreter for a PTC meeting at her daughter's school, (x) Ms. Murphy not receiving an interpreter at DHS, (xi) Mr. Oko being denied an interpreter at the DC Department of Probation, (x) DC Jail failing to provide Mr. Sawkins an interpreter, (xi) Ms. Stone being denied an interpreter for a swearing in ceremony at the DC Commission on Persons with Disabilities), Ex. I, *ERC Second Supplementary Response* at pp. 4-5 (describing (i) the failure of the District's Comprehensive Psychiatric Emergency

Similarly, Mr. Nelson's experience with the Government "not knowing how to process [a] request and/or find an interpreter" is typical of Deaf members in the class.[82]  Numerous other class members have had the same problem, where the District indicates that an interpreter will be provided but fails to properly process the request.[83]

Mr. Mitchiner's experience with receiving an unqualified interpreter from the Government is also typical of Deaf members in the class.[84]  Plaintiffs have identified other class members who have received unqualified interpreters.[85]  Furthermore, Mr. Mitchiner's experience

---

Program to provide interpreters in multiple incident, and (ii) the failure of the police department to provide interpreters to Mr. Grossinger); Ex. A, *Bienvenu Report* at p. 22.

[82] Ex. A, *Bienvenu Report* at p. 22.

[83] *See* Ex. K, *Grossinger Dep.* at 41:20 – 42:1 (Indicating that he was informed that he Public Schools could not provide an interpreter because they "they could not find an interpreter."); *see* Ex. H, *ERC Supplementary Response* at pp. 4-6 (describing problems of (i) Ms. Baches who timely requested an interpreter and was informed one would be provided only to arrive and find no interpreter had been obtained, (ii) Mr. Graves who requested an interpreter for a meeting with DC Job Center, was informed one would be provided but when he arrived, no interpreter was available; (iii) Mr. Graves who requested an interpreter for a hearing at the DC Traffic Court, was informed one would be provided but when he arrived, no interpreter was available, (iv) Mr. Graves who requested an interpreter for a meeting at DHS, but was refused an interpreter; (v) Ms. Holston being told that DC Employment Services lacked the resources to help deaf people, (vi) Ms. Holston missing a health care appointment because DHCG lacked a contract to obtain interpreters, (vii) Ms. Stone being denied an interpreter for a swearing in ceremony at the DC Commission on Persons with Disabilities where the District knew she needed an interpreter), Ex. I, *ERC Second Supplementary Response* at pp. 4-5 (describing (i) the District's Comprehensive Psychiatric Emergency Program refusal to provide interpreters in multiple incident, and (ii) the Police Department's promises to obtain an interpreter for Mr. Grossman, but inability to actually follow through on that promise and provide an interpreter.); Ex. A, *Bienvenu Report* at p. 22

[84] *See* Ex. K, Grossinger Depo. at 119:2 – 123:5 (Indicating that an interpreter that was provided was by Child and Family Services was unqualified and could not understand Mr. Grossman's signs and he could not understand the interpreter's signs); *see* Ex. H, *ERC Supplementary Response at pp. 4-6* (indicating that (i) the interpreter provided to Ms. Holston by the Police Department was not qualified and (ii) Mr. Weiner received an unqualified interpreter for a hearing with the DC City Council); *see* Ex. A, *Bienvenu Report* at p. 23.

[85] *See* Ex. A, *Bienvenu Report* at p. 23.

in being told that an interpreter would be available for a Government meeting when in fact no interpreter was available is also typical of Deaf members in the class who "are often told they will receive an interpreter, only for no interpreter to ultimately be provided."[86]  Many other class members have been told an interpreter will be provided but ultimately do not receive an interpreter.[87]

Mr. Mitchiner's problems obtaining an interpreter when dealing with the police is typical of class members who have also had problems obtaining interpreters when dealing with the police.[88]  This experience it typical of the experiences of Class members being unable to obtain an interpreter from the Government when an interpreter is needed on short notice.[89]  Plaintiffs have identified other class members who have reported problems acquiring an interpreter when dealing with the MPD.[90]

---

[86] Ex. A, *Bienvenu Report* at p. 24.

[87] *See* Ex. H, *ERC Supplementary Response* at pp. 4-6 (describing problems of (i) Ms. Baches who timely requested an interpreter and was informed one would be provided only to arrive and find no interpreter had been obtained, (ii) Mr. Graves who requested an interpreter for a meeting with DC Job Center, was informed one would be provided but when he arrived, no interpreter was available; (iii) Mr. Graves who requested an interpreter for a hearing at the DC Traffic Court, was informed one would be provided but when he arrived, no interpreter was available, (iv) Mr. Graves who requested an interpreter for a meeting at DHS, but was refused an interpreter); Ex. A, *Bienvenu Report* at p. 24.

[88] *See* Ex. A, *Bienvenu Report* at p. 24.

[89] *See* Ex. H, *ERC Supplementary Response* at pp. 4-6 (describing (i) the DC Public Schools failure to provide an interpreter to Ms. Holston for a parent teacher conference at her daughter's school, (ii) failure of DHS – Adult Protective Services to provide an interpreter to Ms. Murphy and (ii) the DMV's inability to provide Mr. Buckman an interpreter.); Ex. I, *ERC Second Supplementary Response* at pp. 4-5 (describing the failure of the District's Comprehensive Psychiatric Emergency Program to provide interpreters in multiple incidents).

[90] Ex. I, *ERC Second Supplementary Response* at pp. 4-5 (describing (the Police Department's promises to obtain an interpreter for Mr. Grossman, but inability to actually follow through on that promise and provide an interpreter.); Ex. A, *Bienvenu Report* at p. 24-25.

Mr. Mitchiner's problems receiving accommodations to participate in a Government meeting remotely are also typical of the Government's inability to provide auxiliary aids to members in the Class for remote communications.[91]  Mr. Mitchiner is not alone.  Plaintiffs have identified at least one other class member who has been denied auxiliary aids.[92]

Other deaf and hard of hearing persons who comprise the class are and will be denied access to government services.  Without a Class to represent them and end the denial of access, many future problems may go unreported and unanswered because many members of the Class are afraid that "complaining will lead to reprisals."[93]  Since Mr. Nelson and Mr. Mitchiner's claims are typical of the claims of the entire class, the typicality requirement of Rule 23(a)(3) is met.

### E.  The Adequacy of Representation Requirement Is Met

Finally, to be certified as a class the Plaintiffs must prove that they will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. Pro. 23(a)(4).  The Plaintiffs meet their burden of proof by showing that 1) the named representative does not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative appears able to vigorously prosecute the interests of the class through qualified counsel.[94]  Here, the Plaintiffs' interests are the same as those of the class – obtaining access to Government benefits and services and preventing discrimination against deaf and hard of hearing persons.  Also, Plaintiffs' counsel are able to vigorously prosecute the interests of the class.

---

[91] *See* Ex. A, *Bienvenu Report* at p. 25.

[92] *See* Ex. H, *ERC Supplementary Response* at pp. 4-6 (indicating that the DC Jail failed to provide Mr. Sawkins with TTY access).

[93] Ex. A, *Bienvenu Report* at p. 20.

[94] *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).

Steptoe & Johnson LLP is an AmLaw 100 firm which has offices throughout the United States and Europe.  It has an extensive *pro bono* program and has handled class action cases and civil rights cases in the past.  Its attorneys have resources and experience at their disposal to draw upon in representing the Plaintiffs.  Also, Defendants do not contest Steptoe & Johnson's qualifications as counsel.  See Defendant District of Columbia's Answer to the Putative Class Action Complaint, paragraph 27.

Since Plaintiffs' interests are the same as those of the entire class, and since Plaintiffs' counsel are qualified to prosecute the interests of the class, Plaintiffs meet the adequacy of representation requirement of Rule 23(a)(4).

**F.      The Washington, D.C. Government Has Refused To Provide Services To A Class Of Citizens**

In addition to satisfying all the requirements of Rule 23(a), Plaintiffs must meet at least one of the elements of Fed. R. Civ. Pro. 23(b).  Plaintiffs satisfy Rule 23(b)(2) because the Washington, D.C. government has consistently refused to provide a way for deaf and hard of hearing persons to communicate with its employees, as demonstrated by the Government's treatment of Mr. Nelson and Mr. Mitchiner.[95]  This court has held that 23(b)(2) has two requirements: (1) that the defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class.[96]

Prior to the creation of ODR, "DC agencies: (1) completely ignored their annual obligations to conduct ADA self-assessments . . . (2) did not have ADA coordinators for extended periods of time, (3) did not receive any training from the District on obligations or

---

[95] *See* 42 U.S.C. § 12131(2); 29 U.S.C. § 705(20).

[96] *See Bynum*, 214 F.R.D. at 37.

compliance with the law, (4) did not advise the public that the agencies would provide

accommodations on request; and (5) made no efforts to confirm that the interpreter being

provided was qualified."[97]  Notwithstanding the creation of ODR and improvements made by

ODR, the improvements still "do not place Deaf people on equal footing with the hearing in their

communications with District agencies and use of District programs."[98]  Complaints regarding

the Government's refusal to provide auxiliary aids to Class members continue to arise post-ODR.

The Government's refusal to provide means for deaf and hard of hearing persons to

communicate with District employees are generally applicable to the Class.  The refusal

demonstrates that the Government has its policy is ineffective as it is incomplete, deficient and in

some cases simply not followed.  This results in discriminatory distribution of Government

services by denying those services to persons who are deaf or hard of hearing.  The

discriminatory treatment and failure to accommodate deaf and hard of hearing persons raise

claims that are precisely the sorts of claims that Rule 23(b)(2) was designed to facilitate.[99]  Since

the Government fails to provide services to deaf and hard of hearing persons as a class, the first

prong of Rule 23(b)(2) is met.

And since Plaintiffs are only seeking declaratory and injunctive relief for the class, the

second prong of Rule 23(b)(2) is also met.[100]  Since the Rule 23(a) and 23(b)(2) requirements

have been met, class certification is appropriate in this case.

---

[97] Ex. A, *Bienvenu Report* at p. 27.

[98] *Id.*

[99] *See Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("As the Advisory Committee Notes explain, 23(b)(2) was adopted in order to permit the prosecution of civil rights actions").

[100] *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief.")

**V.      CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs'

motion for class certification.

Dated: July 22, 2010                              Respectfully Submitted,

                                                  /s/ Michael J. Baratz_____
                                                  Michael Baratz Bar No. 480607
                                                  Scott Watkins Bar No. 445876
                                                  **STEPTOE & JOHNSON LLP**
                                                  1330 Connecticut Avenue, NW
                                                  Washington, D.C. 20036
                                                  Telephone: (202) 429-3000
                                                  Facsimile: (202) 429-3902

                                                  /s/ E. Elaine Gardner_____
                                                  E. Elaine Gardner Bar No. 271262
                                                  **WASHINGTON LAWYERS'**
                                                  **COMMITTEEE FOR CIVIL RIGHTS**
                                                  **AND URBAN AFFAIRS**
                                                  11 Dupont Circle, NW, Suite 400
                                                  Washington, D.C. 20036
                                                  Telephone: (202) 319-1000
                                                  Facsimile: (202) 319-1010

                                                  *Counsel for Plaintiffs, Jon Mitchiner,*
                                                  *David Nelson & The Equal Rights Center*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July, 2010 I caused the foregoing Plaintiff's Motion for Class Certification, Memorandum of Points and Authroities and Exhibits thereto to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Grace Graham
Assistant Attorney General
District of Columbia Office of the Attorney General
441 4th Street, NW, Suite 6S014
Washington, DC 20001
Grace.graham@dc.gov

Attorney for Defendant District of Columbia

 /s/ Korey J. Barry
Korey J. Barry
Senior Litigation Paralegal
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036